**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ROBERT J. INFUSINO,
c/o National Student Legal Defense Network
1015 15th Street NW, Suite 600, Washington
D.C. 20005,

EMMANUEL DUNAGAN,
c/o National Student Legal Defense Network
1015 15th Street NW, Suite 600, Washington
D.C. 20005,

KEISHANA MAHONE,
c/o National Student Legal Defense Network
1015 15th Street NW, Suite 600, Washington
D.C. 20005,

RACHEL DELIBASICH,
c/o National Student Legal Defense Network
1015 15th Street NW, Suite 600, Washington
D.C. 20005, and

JESSICA SCHEIBE,
c/o National Student Legal Defense Network
1015 15th Street NW, Suite 600, Washington
D.C. 20005,

on behalf of themselves and all others
    similarly situated,

　　　　　*Plaintiffs*,

　　　vs.

BETSY DEVOS, in her official capacity as
    U.S. Secretary of Education,
400 Maryland Avenue, SW
Washington, DC 20202, and

U.S. DEPARTMENT OF EDUCATION,
400 Maryland Avenue, SW
Washington, DC 20202,

　　　　　*Defendants*.

Case No. 19-3162

## **COMPLAINT**

Plaintiffs Robert J. Infusino, Emmanuel Dunagan, Keishana Mahone, Rachel Delibasich, and Jessica Scheibe hereby sue Defendants Betsy DeVos, in her official capacity as United States Secretary of Education, and the United States Department of Education (collectively, the "Department"), and allege as follows:

1.      Plaintiffs Infusino, Dunagan and Mahone are former students of the for-profit Illinois Institute of Art ("IIA") and Plaintiffs Delibasich and Scheibe are former students of the for-profit Art Institute of Colorado ("AIC").  On May 3, 2018, the Department sent letters to both schools to address a problem that the Department had known about for many months: the schools had lost their accreditation on January 20, 2018, when they were purchased by new owners.  *See* Exh. A (May 3, 2018 Letter from Michael Frola to David Ray, Interim President of IIA) and Exh. B (May 3, 2018 Letter from Michael Frola to Elden Monday, Interim President of AIC).  In the letters, the Department recognized that "[d]ue to this accreditation status, [each school] no longer qualifies as an eligible institution to participate in the Title IV, HEA programs as a for-profit institution."  Exhs. A & B at 2.  That meant that as of January 20, the Department was legally prohibited from issuing loans to students to attend these schools.  Yet this is precisely what it had done.

2.      Despite the fact that the loans issued to students after January 20, 2018 were unlawful because they were issued to students to attend ineligible institutions, the Department did not disclose this to students.  Instead, the Department attempted to unlawfully fix and conceal its earlier misconduct.  In the May 3 letters, the Department told the schools that in order "[t]o avoid the lapse of eligibility . . . the Department is granting the institution temporary interim non-profit status . . . effective January 20, 2018."  *Id.*  The Department did not disclose

any grounds for its abrupt conversion of these for-profit schools to non-profit schools.  And, even if the schools genuinely qualified for non-profit status from May 3 forward—which they did not—the Department lacked authority to confer that status retroactive to January 20.

3.      These actions by Secretary DeVos and the Department of Education, which were arbitrary and capricious and in violation of law, caused students at IIA and AIC to incur debt to the Department to pay tuition for unaccredited credits and unaccredited degrees.

4.      Absent the Department's unlawful actions, the schools could not have participated in the Title IV student aid programs and students, therefore, would have been ineligible to take out Title IV loans from the government to pay tuition for unaccredited courses.

5.      The Department's decisions allowing IIA and AIC to participate in Title IV, and students to take out loans to attend those schools, exceeded its statutory authority under the HEA and violated the Administrative Procedure Act.

6.      Defendants' actions caused students at the schools to borrow money and waste months of their lives in pursuit of an education they did not know was unaccredited.  As a direct result of Defendants' conduct, Named Plaintiffs and members of the putative Class have incurred debt from the Department that currently requires, or imminently and certainly will require, monthly payments to be made to pay off that debt.

7.      For these reasons, and as described more fully below, the Court should certify a Class of individuals to whom the Department issued loans to pay for tuition and expenses to attend IIA and AIC on or after January 20, 2018; hold that the Department's actions of allowing the schools to participate in the Title IV programs and allowing students to take out loans that they were not eligible for, and then retroactively converting the schools to temporary non-profit status to create the fiction that they were eligible to participate in Title IV were unlawful,

arbitrary and capricious, exceeded the Department's statutory authority and violated their due process rights; and declare that any loans issued under these circumstances are similarly unlawful and void *ab initio*, order the Department to vacate those loans and provide other equitable remedies as herein alleged.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law.

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because Defendants are an officer and an agency of the United States and are located in the District of Columbia.

## PARTIES

10.     Plaintiff Robert J. Infusino is a natural person who resides, and at all relevant times has resided, in Addison, IL.  Mr. Infusino was enrolled as a student at IIA's Schaumburg campus from October 2015 until he withdrew in September 2018.  Mr. Infusino took on $7,500 in Department-issued debt to pay tuition and expenses to enroll at IIA after January 20 2018, and he currently owes over $7,620 on this debt (including interest).

11.     Plaintiff Emmanuel Dunagan is a natural person who resides, and at all relevant times has resided, in Bellwood, IL.  Mr. Dunagan was enrolled as a student at IIA's Chicago campus from December 2014 until he graduated in December 2018.  Mr. Dunagan took on $10,646 in Department-issued debt to pay tuition and expenses to enroll at IIA after January 20, 2018, and he currently owes over $11,320 on this debt (including interest).

12.     Plaintiff Keishana Mahone is a natural person who resides, and at all relevant times has resided, in Chicago, IL.  Ms. Mahone was enrolled as a student at IIA's Chicago campus from July 2017 until she withdrew in July 2018.  Ms. Mahone took on $3,500 in

Department-issued debt to pay tuition and expenses to enroll at IIA after January 20, 2018, and she currently owes over $3,650 on this debt (including interest).

13.     Plaintiff Rachel Delibasich is a natural person who currently resides in Port Jefferson Station, NY.  At other times relevant to this Complaint, Ms. Delibasich resided in Denver, CO.  Ms. Delibasich was enrolled as a student at AIC from November 2017 until she withdrew in July 2018.  Ms. Delibasich took on $10,500 in Department-issued debt to pay tuition and expenses to enroll at AIC after January 20 2018, and she currently owes over $9,900 on this debt (including interest).

14.     Plaintiff Jessica Scheibe is a natural person who currently resides in Denver, CO. At other times relevant to this Complaint, Ms. Scheibe resided in Sedalia, CO, and Glendale, CO.  Ms. Scheibe was enrolled as a student at AIC from June 2016 until she withdrew in July 2018. Ms. Scheibe took on $4,832 in Department-issued debt to pay tuition and expenses to enroll at AIC after January 20 2018, and she currently owes over $5,170 on this debt (including interest).

15.     Defendant Betsy DeVos is sued in her official capacity as U.S. Secretary of Education.

16.     Defendant United States Department of Education is a federal agency headquartered in Washington, DC, at 400 Maryland Avenue, SW, Washington, D.C. 20202.

## FACTUAL ALLEGATIONS

## I.     PARTICIPATION IN TITLE IV OF THE HIGHER EDUCATION ACT

17.     Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 *et seq.*, governs the administration of the federal student loan program.  In order to participate inTitle IV programs, for-profit or proprietary colleges must satisfy the eligibility criteria set forth in HEA §§ 101-102, 20 U.S.C. §§ 1001-1002.  *See* HEA § 453(d), 20 U.S.C. § 1087c(d).  The

Department has adopted implementing regulations that provide greater specificity regarding the eligibility criteria and mandate that, to participate in the Title IV programs, for-profit institutions must satisfy the criteria in 34 C.F.R. § 600.5(a)(6)—including the requirement that they are "accredited."  Non-profit institutions must satisfy the criteria in 34 C.F.R. § 600.4(a)(5)(i).  *See also* HEA § 101(a), 20 U.S.C. § 1001(a).  Non-profit institutions are permitted—distinct from for-profit schools—to qualify for Title IV if they are accredited *or* if they are preaccredited.  *Id.*

18.     Institutions that are eligible for Title IV (or "eligible institutions") must enter into a Program Participation Agreement with the Department in order to participate in any of the Title IV programs.  HEA § 487, 20 U.S.C. § 1094.

19.     "The Secretary may not select an institution of higher education for participation under this section unless such institution is an eligible institution under . . . this title."  HEA § 453(d), 20 U.S.C. § 1087c(d).

20.     When an institution undergoes a change in ownership resulting in a change of control, that institution "ceases to qualify as an eligible institution upon the change in ownership." 34 C.F.R. § 600.31(a)(1).  However, the Secretary may continue the institution's participation in those programs on a provisional basis "*if* the institution under the new ownership submits a materially complete application that is received by the Secretary no later than 10 business days after the change occurs."  34 C.F.R. § 600.20(g)(1) (emphasis added).  *See also* 34 C.F.R. § 600.31(a)(1)-(2) (granting an exemption to the mandatory eligibility loss for institutions that qualify provisionally under 34 C.F.R. § 600.20(g)).

21.     A "materially complete application" must be supported by "[a]copy of the document from the institution's accrediting association that—as of the day before the change in

ownership—granted or will grant the institution accreditation status." 34 C.F.R. §

600.20(g)(2)(ii).

22.     If the Secretary approves the institution's "materially complete application," she

then provides the institution with a Provisional or Temporary Program Participation Agreement.

A Provisional or Temporary PPA ("TPPA") expires on the last day of the month following the

month in which the change of ownership occurred.  34 C.F.R. § 600.20(h)(2)(iii).  In order for

the Secretary to extend the TPPA after the expiration date, the institution *must* provide the

Secretary with, among other things, documentation of the "approval of the change of ownership

from the institution's accrediting agency."  34 C.F.R. § 600.20(h)(3)(iii).

23.     Students attending schools that are participating in the Title IV Direct Loan

program are eligible to borrow money to pay for tuition and living expenses.  HEA § 484, 20

U.S.C. § 1091.  By doing so, they incur obligations to the federal government to pay back those

loans, beginning six months after they complete their education.  34 C.F.R. § 685.207(b)(2)(i);

34 C.F.R. § 685.207(c)(2)(i).  Under the Master Promissory Note that students enter into with the

Department to receive such loans, failure to pay back those loans can result in the Department

taking any or all of the following actions: require the student to pay late charges and collection

costs; capitalize all outstanding interest of the loan, which increases the principal balance of the

loan; render the full amount of the loan, including the principal balance and capitalization of

interest, as well as collection costs, immediately due and payable; report the failure to pay to the

nationwide consumer reporting agencies (credit bureaus), thereby significantly and adversely

affecting the student's credit history; garnish the student's wages; take all or part of the student's

federal and state tax refunds and other federal or state payments; and sue the student to collect

the amount due, including court costs and attorney fees.

## II.   IIA AND AIC ARE PURCHASED BY THE DREAM CENTER FOUNDATION

24.     Prior to January 20, 2018, IIA and AIC were owned by the Education Management Corporation ("EDMC").  On March 3, 2017, EDMC executed an agreement for the sale of substantially all of its assets, including three large for-profit school systems, to the Dream Center Foundation ("DCF"), a California non-profit corporation.  IIA and AIC were among the schools included in the sale.  DCF completed the purchases of IIA and AIC on January 20, 2018.

25.     DCF formed an Arizona non-profit limited-liability company called Dream Center Education Holdings ("DCEH") on January 9, 2017 to facilitate the sale of assets between EDMC and DCF.

26.     DCF applied to the Department of Education for approval of the change in ownership of IIA, AIC and the other schools it purchased from EDMC.  As part of that application, DCF sought approval to convert all of the schools it had purchased from EDMC to non-profit status.  Approval of such conversion would result in the schools being relieved of certain statutory and regulatory requirements, such as the 90/10 and Gainful Employment provisions.

27.     The HEA and its accompanying regulations require the Department to establish that a non-profit school does not exist to serve the interests of its owners, executives, or any other private individual.  HEA § 103, 20 U.S.C. § 1003; 34 C.F.R. § 600.2.

28.     On September 12, 2017, the Department communicated the results of its Preacquisition Review of the Proposed Change in Ownership and Conversion to Nonprofit Status of the schools purchased by DCF from EDMC.  Exh. C.  The Department did not pre-approve the conversion of the schools to non-profit status, finding that they failed to satisfy all of the elements required for non-profit status under 34 C.F.R. § 600.2.  In this regard, the Department

explained that, prior to granting non-profit status, "DCF will have to submit additional documents and information" to confirm that it satisfies the requirements for non-profit status. Exh. C at 6. Among other things, the Department required DCF and DCEH to "provid[e] all state and IRS [non-profit] approvals" and "establish that the Institutions' net income does not benefit any party other than the Institutions." *Id.*; *see also id.* at 10-12 (listing numerous documents that DCF "must submit" in order for the Department to complete its review).

29.     The Department specified that "[u]nless and until the conversion to nonprofit institution status is approved by the Department . . . the Institutions must continue to report their Title IV revenue percentages ('90/10 percentages') and its gainful employment data." *Id.* at 16.

30.     The Department further explained that approval of the change in ownership and non-profit status was contingent on the Dream Center's compliance with 34 C.F.R. § 600.20(g) and (h). *Id.* at 7-10.

31.     In an October 4, 2017 follow up letter to DCEH, the Department reaffirmed that, "[a]s stated in the [September 12 letter], formal approvals of the [change in ownership] and conversion to nonprofit status are contingent on the [Dream Center's] compliance with the requirements of 34 C.F.R. § 600.20(g) and (h); the Department's approval of any submissions required by those regulatory provisions; any further documentation and information requested by the Department . . . [and the] Parties' compliance with the conditions set forth in the [September 12] Preacquistion Response." Exh. D at 1-2.

32.     Upon information and belief, the Department did not approve the conversion to non-profit status of any of the schools purchased by DCF from EDMC prior to May 3, 2018.

### III.   IIA AND AIC LOSE THEIR ACCREDITATION WHEN CONTROL CHANGES FROM EDMC TO DCF

33.     Accreditation is the most powerful signal that one can have confidence in a college or university.  Accreditation is especially critical to students' efforts to obtain employment and transfer credits to other educational institutions.  When choosing a college, therefore, there is perhaps no fact more consequential than whether or not it is accredited.

34.     While they were owned by EDMC, IIA and AIC were accredited by the Higher Learning Commission ("HLC").  Prior to the formal change of control from EDMC to DCF, the schools applied to HLC for approval of their applications for Change of Control, Structure, or Organization.

35.     On November 16, 2017, HLC issued its formal notification of action regarding those applications.  HLC determined that the schools did not satisfy its criteria for accreditation, but "demonstrated sufficient compliance with the Eligibility Requirements to be considered for *preaccreditation status* identified as 'Change of Control Candidate for Accreditation,' during which time each Institute can rebuild its full compliance with all the Eligibility Requirements and Criteria for Accreditation and can develop evidence that each Institute is likely to be operationally and academically successful in the future."  Exh. E at 2 (emphasis added).

36.     In their capacity as officials in, and representatives of, the U.S. Department of Education, Michael Frola and Herman Bounds were copied on HLC's November 16 notification of action to the schools.

37.     By letter dated November 29, 2017, the schools and parent company DCEH accepted HLC's determination.  Exh. F.

38.     On January 12, 2018, HLC sent a letter to the schools, requiring them to inform their students of the change in accreditation status and the potential impact on them.  Exh. G.

Department officials Frola and Bounds were also copied on this correspondence.  HLC also issued a Public Disclosure Notice, effective January 20, 2018, setting forth these obligations of the schools to their students.  Exh. H.

39.     The schools did not inform IIA or AIC students of the change of accreditation status before they enrolled for the academic semester beginning in January 2018 or when the change of control was finalized on January 20, 2018.  Instead, the schools altered their websites, course catalogs, and enrollment forms to falsely state:  "*We remain accredited* as a candidate school seeking accreditation under new ownership and our new non-profit status."  (Emphasis added.)

40.     The schools also told students on either January 23 or 24 that each of their schools was "now a non-profit institution!"  At that time, their requests to be converted to non-profit status had not been approved by the Department of Education.

IV.     **THE DEPARTMENT PERMITS IIA AND AIC TO PARTICIPATE IN TITLE IV IN VIOLATION OF LAW**

41.     On February 20, 2018, the Department executed TPPAs with IIA and AIC, allowing them to participate in the Title IV programs.  That action violated HEA § 453(d), 20 U.S.C. § 1087c(d), which states that "[t]he Secretary may not select an institution of higher education for participation under this section unless such institution is an eligible institution under . . . this title."  That action also violated 34 C.F.R. § 600.5, which sets forth the criteria for proprietary institutions of higher education to participate in programs authorized by the HEA.  *See* 34 C.F.R. § 600.1.  Pursuant to 34 C.F.R. § 600.5(a)(6), proprietary schools must be accredited in order to be eligible to participate in the Title IV, HEA programs.  *See also* HEA § 102(a)(1)(A), 20 U.S.C. § 1002(a)(1)(A).

42.     This action also violated 34 C.F.R. § 600.20(g), which permits the Department to issue a TPPA to an institution that has undergone a change in control only if the institution submits a "materially complete application" that includes documentation that accreditation has been granted.

43.     Because the schools were not eligible to participate in the Title IV programs, students, including Named Plaintiffs, were not eligible to receive loans from the government to pay tuition to the schools.  HEA § 484(a)(1), 20 U.S.C. § 1091(a)(1).

44.     Despite the schools not being eligible to participate in the Title IV programs, and the students therefore not being eligible to receive loans, the Department issued loans to Named Plaintiffs and members of the class to pay tuition to attend IIA and AIC after January 20, 2018, where they earned unaccredited credits and degrees.  These loans were issued unlawfully.

45.     The Department notified the schools by letter dated February 20, 2018, that the TPPAs would continue on a month-to-month basis if, prior to February 28, the stated expiration date of the TPPAs, the institution submitted certain documents including "approval of the change in ownership by the institution's accrediting agency."

46.     The documents referenced in the February 20 letter correspond with the requirements of 34 C.F.R. § 600.20(h)(3) as well as the conditions set forth by the Department in its September 12 Preacquisition Review letter.  Exh. C at 9 ("At the Department's discretion, the TPPA may be extended on a month-to-month basis *only if,* prior to the expiration date, an institution submits . . . [a]pproval of the [change in ownership] from the institution's accrediting agency.")  (Emphasis added.)  Because HLC never approved the change in ownership, the schools could not have submitted the approval to the Department.  Nevertheless, on information and belief, the Department continued the TPPAs on a month-to-month basis through the schools

closing on December 14, 2018.  Each monthly continuation was a violation of 34 C.F.R. §

600.20(h)(3).

47.     On May 3, 2018, Michael Frola, the Director for the Department's Multi-Regional

and Foreign School Participation Division, sent identical letters to the Presidents of IIA and AIC

acknowledging that the schools were not eligible to participate in the Title IV programs and had

not been on January 20, 2018, when their purchase by DCF became effective, or on February 20,

2018, when the TPPAs were executed.  Exhs. A & B.

48.     The Department's May 3 letters state that "[w]ith regard to accreditation approval

. . . the Department has learned that HLC transitioned the Art Institute from being accredited to

being a candidate for accreditation effective January 20, 2018." *Id.* at 2.

49.     But in reality, the Department had learned that the schools would not be

accredited on or about November 16, 2017, when Mr. Frola and Mr. Bounds were copied on

HLC's formal notice of determination to the schools.

50.     The Department's May 3 letters also state that "[t]he provisions of 34 C.F.R. §

600.5(a)(6) require a proprietary institution of higher education to be fully accredited to qualify

as an eligible institution for purposes of the Title IV, HEA programs, and do not allow for pre-

accredited (or candidacy status)." *Id.*  As a result of IIA and AIC's change in accreditation

status, the Department concluded that "the Art Institute no longer qualifies as an eligible

institution to participate in the Title IV, HEA programs as a for-profit institution." *Id.*

51.     The Department did not end the Title IV participation of the schools, despite

knowing they were ineligible.  Nor did it disclose to IIA and AIC students that it had improperly

allowed the unaccredited schools to participate in Title IV programs beginning January 20, 2018,

resulting in the issuance of unlawful Title IV loans to students to pay tuition for credits and

12

degrees that, unbeknownst to students, were unaccredited.  Instead, the Department wrote, "[t]o

avoid the lapse of eligibility, and given the pending application for the change of ownership that

includes a requested conversion to non-profit status, the Department is granting the institution

temporary interim non-profit status during the review of the pending change of ownership

application, to the Art Institute, effective January 20, 2018."  *Id.*  Non-profit schools are qualified

to participate in Title IV programs with preaccredited status.  34 C.F.R. § 600.4(a)(5)(i).  *See

also* HEA § 101(a)(5), 20 U.S.C. § 1001(a)(5).

52.     The letters do not describe any basis for the temporary, retroactive conversions to

non-profit status for these two schools, other than to render the schools eligible to participate in

Title IV programs.  There is no discussion of the schools satisfying the conditions for non-profit

conversion under the HEA, and that the Department set forth in its September 12, 2017 letter,

including that they "provid[e] all state and IRS [non-profit] approvals" and "establish that the

Institutions' net income does not benefit any party other than the Institutions."  Exh. C at 6.

There is also no discussion of the voluminous "Additional Documents and Information" that the

Department required in order to complete its review of the conversion to non-profit status.  *Id.* at

10-12.  Further, none of the other schools that DCF and DCEH had sought non-profit status for

were converted, even though they had to meet the same criteria as IIA and AIC.  The May 3

letters make clear that IIA and AIC were not relieved of the obligations that attach to proprietary

institutions, including the 90/10 requirement and the gainful employment regulations.  Exhs. A &

B at 2.

53.     Even if the schools had satisfied the criteria for conversion to non-profit status—

which they did not—the Department had no statutory or regulatory authority for granting a

"temporary interim non-profit status" retroactively, and the Department's letters do not indicate otherwise.

54.     The *only* reason stated by the Department for conferring non-profit status on IIA and AIC was to retrospectively provide a basis for its previous unlawful decision to allow the schools to participate in Title IV despite not being eligible, and to continue allowing them to participate in Title IV going forward.

55.     The May 3 letters go on to say that "[a]lthough the Art Institute has not provided approval of the change in ownership by HLC, the Department understands that the matter is proceeding in accordance with HLC's normal process." *Id.* at 2.  The letters do not describe the basis for the Department's understanding.  Upon information and belief, the schools were not making progress in securing approval of the changes in ownership from HLC, but instead were locked in a disagreement about HLC's accreditation decision.  The schools had not appealed HLC's decision to change their accreditation status.

56.     The continuation of the schools' TPPAs, despite the schools having failed to provide documentation of the approval of the change in ownership by the schools' accreditor HLC, constituted a violation of 34 C.F.R. § 600.20(h)(2)(iii).

57.     The Department's May 3 letters were not copied to HLC, and, upon information and belief, HLC was not informed by the Department or the schools that the schools had been converted to non-profit status.  Upon information and belief, neither the Department nor the schools informed faculty, students, or the public that IIA and AIC had been converted to non-profit status.

58.     The May 3 letters conclude by explaining that: "[i]n the February 20, 2018 letter transmitting the Temporary PPA, the Department notified the Art Institute that the Eligibility and

Certificate Approval Report ('ECAR') under which the institution had been operating prior to the change in ownership remained in effect with respect to approval of locations, educational programs, and the Title IV, HEA programs.  The ECAR identified the institution as a proprietary institution of higher education.  The Department will not be issuing a new ECAR reflecting the temporary designation of non-profit status.  This letter will serve as evidence of the Art Institute's temporary conditional approval as a non-profit institution."  Exhs. A & B at 2.

59.     The ECAR is an official, standardized government document, containing the most critical data elements that form the basis of the school's approval, including the institution type (e.g., public non-profit; private non-profit; for-profit)—which typically appears on almost every page of the document—and the accreditation status.  The Department's letters do not explain why it elected not to issue the ECAR with correct information about the schools' institution type, but rather limited the documentation of that status to letters sent privately to the schools.

**V.      IIA AND AIC LOSS OF ACCREDITATION IS REVEALED**

60.     As of May 3, 2018, the date of the Department's letters to IIA and AIC, students at the schools had not been informed that HLC had changed the schools' accreditation status.  Upon information and belief, the Department knew at that time that students had not been informed about the change in accreditation status.

61.     Around the time that the Department sent the May 3 letters, the schools' owners had "determined that the [university systems it had purchased from EDMC, which includes IIA and AIC] projected an estimated operating loss of $38 million in Fiscal Year 2018 . . ., $64 million in fiscal year 2019, and nearly $69 million in fiscal year 2020."  Exh. I at ¶ 7 (Declaration of Randall Barton in Support of South University of Ohio, LLC's, Dream Center Education Holdings LLC's, and Argosy Education Group, LLC's Response to Plaintiff Digital Media Solutions' Emergency Motion for the Appointment of a Receiver and Entry of a

Temporary Restraining Order and Preliminary Injunction, *Digital Media Solutions, LLC v. South University of Ohio*, Case No. 1:19-cv-00145, Dkt. 7-1 (Jan. 18, 2019))..

62.    After the projected losses for Fiscal Year 2018 were determined, DCEH and DCF decided to close thirty campuses, including IIA and AIC. *Id.* ¶ 8.

63.    The Department was aware of these closures because it was working with DCEH on a plan to close the schools. *Id.* It entered into Amended TPPAs with the schools that allowed them to remain eligible for Title IV funding until they closed at the end of 2018. *Id.*

64.    Students were not told that the schools would close until July 2018.

65.    Students found out that their schools had lost accreditation because media reports forced the schools to reveal it. On June 19, 2018, the *Pittsburgh Post-Gazette* published an article exposing that HLC had removed the schools' accreditation on January 20, 2018, and that "Art Institute schools failed to communicate that change to students, as the Higher Learning Commission had instructed in its Jan. 20 letter to Dream Center." Daniel Moore, "Deal Under Scrutiny as Art Institutes Face Accreditation Setbacks," *PITTSBURGH POST-GAZETTE* (June 19, 2018), *available at:* https://www.post-gazette.com/business/career-workplace/2018/06/19/Deal-under-scrutiny-Art-Institutes-accreditation-setbacks-dream-center/stories/201806140022.

66.    The next day, IIA and AIC Presidents sent identical emails to their students informing them that "[w]e are a candidate school seeking accreditation under new ownership and our new non-profit status. During candidacy status, an institution is not accredited[,] but holds a recognized status with HLC indicating the institution meets the standards for candidacy. Our students remain eligible for Title IV funding. DCEH continues to actively work with HLC to earn reinstatement of accreditation." Those emails, which still did not disclose that accreditation

was lost in January 2018, were the first communications that students, including Named

Plaintiffs, received from their schools acknowledging that they were not accredited.

67.     On July 2, 2018, DCEH announced that it was ceasing enrollment at IIA and AIC

campuses and that both schools' campuses would close at some time in the future.  DCEH did

not announce a closure date and it did not inform students of their right to seek a closed school

discharge.  *See infra* Section VI.

68.     Shortly after the students returned to campus in July 2018, DCEH Chief

Operating Officer John Crowley visited IIA's Chicago campus to discuss the previously

concealed accreditation status and imminent closure with students.

69.     On July 11, 2018, Mr. Crowley had the following exchange with students at IIA-

Chicago:

> Student: Why did the school fail to tell us that it's not accredited after January?
> You still need to inform your students.  We are paying money.
>
> Crowley: Understood, understood.  So the DOE has granted us Title IV, which
> means you are okay.   HLC said we are gonna be okay.  So we assumed we were
> gonna be okay.
>
> Student: . . . . How can you just think it is okay to not tell your students?
>
> Crowley:  After the last three meetings, I don't think it is okay.  But it is what we
> did.

70.     Before Mr. Crowley visited IIA, the Department told him and other officers of

DCEH and DCF that Principal Deputy Under Secretary of Education Diane Auer Jones had

spoken to HLC and that "HLC is in sync with retro accridation [sic]."  Exh. J (July 3, 2018 Email

from Randall Barton (DCEH Chairman of the Board and DCF Managing Director) to Ronald L.

Holt (DCEH/DCF outside counsel), John Crowley and others).  Based on these communications

from the Department, Mr. Crowley told students and staff that the Department of Education was working with DCEH to persuade HLC to restore the schools' accreditation.

71.     During one July 11, 2018 meeting with IIA staff in Chicago, Mr. Crowley stated: "We have met with DOE. The DOE is working with HLC to get this accreditation issue gone. They went so far as to change a regulation at DOE to make it easy for HLC to help us. . . . There's a real good shot that everything's gonna be fine."

72.     During a separate July 11 meeting, Mr. Crowley told students: "we've worked with the DOE, I've personally been to Washington, we have sat with the Undersecretary of Education, and we believe that everyone is going to be accommodated. They just have to run their process."

73.     On July 25, 2018—two weeks after Mr. Crowley told students that the Department was helping to restore the schools' accreditation retroactively by changing Department regulations—Principal Deputy Under Secretary Diane Auer Jones issued a Memorandum retracting a non-binding guidance the Department had issued on June 6, 2017. Exh. K.

74.     Whereas the June 6, 2017 guidance expressed the Department's position that accreditors could not confer retroactive accreditation, the July 25, 2018 Memorandum announced a new policy permitting accrediting agencies: "to establish a retroactive accreditation date that goes back no farther than the beginning of the initial accreditation review process to ensure that credits and credentials awarded to students who were enrolled or completed a program during the formal initial accreditation review, or a review following a change in ownership or control, are from an accredited program." *Id.* at 1.

75.     In the memorandum, the Department took the position that accreditors would be acting within their authority by conferring the kind of retroactive accreditation on IIA and AIC that the schools and their owners were seeking.  HLC declined to do so.

## VI.   <u>CLOSED SCHOOL DISCHARGE</u>

76.     The HEA requires the Secretary of Education to discharge a federal student loan if a borrower is unable to complete their program due to a school's closure. HEA § 437(c)(1), 20 U.S.C. § 1087(c)(1).  *See also* HEA § 455(a)(1), 20 U.S.C. § 1087e(a)(1).

77.     The Department's regulations provide that a closed school discharge must be granted if a borrower is enrolled at the school at the time it closed or withdrew not more than 120-days prior to the school's closure.  34 C.F.R. § 685.214(c)(1)(i)(B).  The Secretary may extend the 120-day period if she "determines that exceptional circumstances related to a school's closing justify an extension."  *Id.*  Exceptional circumstances for this purpose, "may include, but are not limited to: the school's loss of accreditation" as well as a "finding by a State or Federal government agency that the school violated State or Federal law."  *Id.*

78.     The stated policy of the Department, however, is that the current regulations are insufficient in this regard.  On September 23, 2019, the Department published Final Regulations in the *Federal Register*, effective July 1, 2020, that automatically extends this 120-day window to 180-days.  *See* Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 84 Fed. Reg. 49,788, 49,890 (Sept. 23, 2019) ("The final regulations expand the eligibility window for students with Direct loans first disbursed on or after July 1, 2020, who left the institution but are still eligible to receive closed school loan discharges from 120 to 180 days.").

79.     In addition, in that same Final Rule, the Department amended "[t]he non-exclusive list of exceptional circumstances" in numerous ways, including by changing the

exceptional circumstance of "loss of accreditation" to include "the revocation or withdrawal by an accrediting agency of the school's institutional accreditation."  The Department also amended the list to add the "termination by the Department of the school's participation in a title IV, HEA program."  84 Fed. Reg. at 49,850.

80.     Because IIA and AIC remained open, participating in Title IV, until December 14, 2018, students are only eligible for a closed school discharge if they were in attendance on that date or withdrew on or after August 16, 2018.  Thus, in order to be eligible for a closed school discharge, students would have had to enroll in summer classes and pay tuition for over a month *after* they learned that their school was not accredited, had been lying to them for six months, and was closing.  Many students, including Plaintiffs Mahone, Delibasich, and Scheibe, are therefore being penalized for their rational decision to withdraw from AIC and IIA in July of 2018, after learning the truth.

81.     Students were also not informed in June, July or August of 2018 about their rights under the closed school discharge regulation, of the date that the schools would close, or of the consequences of their withdrawal, including that withdrawing prior to August 16, 2018 would have significant legal and financial consequences.

82.     When one IIA student asked Mr. Crowley about closed school discharges during a July 11, 2018 meeting, Mr. Crowley refused to provide information, stating: "you gotta contact the federal government on that.  It has nothing to do with us."

83.     According to the Settlement Administrator overseeing a consent judgment between DCEH and forty state attorneys general, IIA and AIC students who withdrew prior to August 16, 2018 did so with no information from their school or the Department about how it would impact their rights to obtain a closed school discharge in the future.  *See* Exh. L at 31-35

(Excerpts of Third Annual Report of the Settlement Administrator Under the Consent

Judgements with EDMC As Succeeded By Dream Center Education Holdings).

84.     The Settlement Administrator found that it was not until September 20, 2018,

over two and-a-half months after the closing announcement, that DCEH provided a "clear, direct

communication to its students regarding the Closed School Discharge and the relevant date." *Id.*

at 34.

85.     DCEH has claimed that it did not provide timely information on closed school

discharges because, "the Department of Education instructed DCEH not to announce that the

schools were closing." *Id.*  at 32.

86.     To date, the Secretary has not used her authority to extend the 120-day period for

IIA and AIC students.

**VII.   HARM TO NAMED PLAINTIFFS AND THE CLASS**

87.     As a result of Defendants unlawfully permitting IIA and AIC to participate in

Title IV from January 20, 2018 until they closed, students at the schools, including Named

Plaintiffs, took out loans and became indebted to the federal government.  Those loans were used

to pay for tuition for credits that were unaccredited.

88.     Defendants' unlawful conversion of IIA and AIC to non-profit status on May 3,

2018, purporting to make the schools eligible to participate in Title IV from January 20, 2018,

allowed them to stay open through December 14, 2018.  Because that conversion was, upon

information and belief, done secretively, the Department concealed from students that the

schools should not have been allowed to participate in Title IV after January 20, 2018, and that

the schools had lost their accreditation.

89.     As a result of Defendants' actions, Named Plaintiff Robert J. Infusino incurred

debt to the federal government for loans taken out to attend IIA after January 20, 2018.

21

Specifically, Mr. Infusino took out $7,500 in federal student loans for his enrollment at IIA after

January 20, 2018.  This includes: (i) a $2,000 federal direct unsubsidized loan originated on

April 27, 2018, which contained a $1,334 disbursement on April 27, 2018 and a $666

disbursement on July 5, 2018; and (ii) a $5,500 federal direct subsidized loan originated on April

27, 2018, which contained a $3,666 disbursement on April 27, 2018 and a $1,834 disbursement

on July 5, 2018.  Mr. Infusino withdrew from IIA on September 4, 2018 and has since enrolled at

Full Sail University. Mr. Infusino currently owes over $7,620 on this post January 20, 2018 debt

(including interest).

90.     As a result of Defendants' actions, Named Plaintiff Emmanuel Dunagan incurred

debt to the federal government for loans taken out to attend IIA after January 20, 2018.

Specifically, Mr. Dunagan took out $10,646 in federal student loans for his enrollment at IIA

after January 20, 2018.  This includes: (i) a $10,146 federal direct unsubsidized loan originated

on March 15, 2018, which contained a $3,407 disbursement on March 15, 2018, a $3,407

disbursement on March 25, 2018, and a $3,332 disbursement on July 5, 2018; and (ii) a $500

federal direct subsidized loan originated on March 15, 2018, which contained $250

disbursements on March 15, 2018, and March 25, 2018.  Because at the time Mr. Dunagan

learned that IIA was not accredited, all that remained for him to complete his degree was an

internship, he remained enrolled through December 2018, incurring more debt to the federal

government.  Had the Department ended IIA's eligibility to participate in Title IV on May 3,

rather than extending it by unlawfully converting it to non-profit status, Mr. Dunagan would not

have incurred further debt to the federal government to attend IIA.  Mr. Dunagan currently owes

over $11,320 on this post January 20, 2018 debt (including interest).

91.     As a result of Defendants' actions, Named Plaintiff Keishana Mahone incurred debt to the federal government for loans taken out to attend IIA after January 20, 2018. Specifically, Ms. Mahone took out $3,500 in federal student loans for her enrollment at IIA after January 20, 2018.  This includes: (i) a $2,000 federal direct unsubsidized loan originated on June 11, 2018, which contained a $2,000 disbursement on June 11, 2018 and (ii) a $1,500 federal direct subsidized loan originated on June 11, 2018, which contained a $1,500 disbursement on June 11, 2018.  Upon learning that IIA was not accredited, Ms. Mahone withdrew from the school in July 2018.  Because the school remained open through December 14, 2018, Ms. Mahone was not eligible for closed school discharge, which would have resulted in all of her loans to attend IIA being discharged.  Ms. Mahone currently owes over $3,650 on this post January 20, 2018 debt (including interest).

92.     As a result of Defendants' actions, Named Plaintiff Rachel Delibasich incurred debt to the federal government for loans taken out to attend AIC after January 20, 2018. Specifically, Ms. Delibasich took out $10,500 in federal student loans for her enrollment at AIC after January 20, 2018.  This includes: (i) a $6,000 federal direct unsubsidized loan originated on January 26, 2018, which contained a $4,000 disbursement on January 26, 2018 and a $2,000 disbursement on March 25, 2018; and (ii) a $4,500 federal direct subsidized loan originated on January 26, 2018, which contained a $3,000 disbursement on January 26, 2018, and a $1,500 disbursement on March 25, 2018.  Upon learning that AIC was not accredited, Ms. Delibasich withdrew from the school in July 2018.  Because the school remained open through December 14, 2018, Ms. Delibasich was not eligible for closed school discharge, which would have resulted in all of her loans to attend IIA being discharged.  Ms. Delibasich currently owes over $9,900 on this post January 20, 2018 debt (including interest).

93.     As a result of Defendants' actions, Named Plaintiff Jessica Scheibe incurred debt

to the federal government for loans taken out to attend AIC after January 20, 2018.  Specifically,

Ms. Scheibe took out $4,832 in federal student loans for her enrollment at AIC after January 20,

2018.  This includes: (i) a $4,332 federal direct unsubsidized loan originated on January 29,

2018, which contained a $2,166 disbursement on January 29, 2018 and a $2,166 disbursement on

March 25, 2018; and (ii) a $500 federal direct unsubsidized loan originated on June 14, 2018,

which contained a $500 disbursement on June 14, 2018.  Upon learning that AIC was not

accredited, Ms. Scheibe withdrew from the school in July 2018.  Because the school remained

open through December 14, 2018, Ms. Scheibe was not eligible for closed school discharge,

which would have resulted in all of her loans to attend IIA being discharged.  Ms. Scheibe

currently owes over $5,170 on this post January 20, 2018 debt (including interest).

94.     As a direct result of Defendants' conduct, as alleged herein, each of the Named

Plaintiffs has incurred debt from the Department that currently requires, or imminently and

certainly will require, payments to be made to pay off that debt.

95.     Each of the Named Plaintiffs' academic transcripts contains an addendum with

the following disclaimer: "Effective January 20, 2018[,] The [Illinois Institute of Art or Art

Institute of Colorado] has transitioned to being a candidate for accreditation after previously

being accredited.  Institute courses completed or degrees earned during the candidacy period are

not accredited by HLC."

## VIII.   THE DEPARTMENT'S ONGOING CONCEALMENT OF ITS UNLAWFUL ACTIONS PERMITTING IIA AND AIC TO PARTICIPATE IN TITLE IV

96.     The Department remained involved with DCEH's administration of IIA and AIC

through their closure.  At no time did it reveal that it had unlawfully permitted the schools to

participate in Title IV by entering into and continuing TPPAs with the schools despite their being

ineligible as a result of losing their accreditation, as well as by converting them to non-profit status retroactive to when they lost eligibility.

97.     Defendants have actively misrepresented their bases for allowing IIA and AIC to participate in Title IV.  In its May 28, 2019 response to written questions from United States Senator Richard Durbin, the Department stated that it "is not true that the campuses were not accredited" after January 2018 and that as of a June 14, 2018 meeting between the Department and DCEH, "the Department believed that [IIA and AIC] were in an accredited status at that time, or the Department would not have allowed the institutions to participate in title IV programs." Exh. M at 1-2.

98.     These statements were not true.  The Department knew that the schools were not accredited as a result of HLC's communications in November 2017 and January 2018, and, in any event, no later than May 3, 2018 when it wrote to the schools that "[w]ith regard to accreditation approval . . . the Department has learned that HLC transitioned the Art Institute from being accredited to being a candidate for accreditation effective January 20, 2018." Exhs. A & B at 2.  The Department also acknowledged in its May 3 letters that it allowed the institutions to participate in Title IV programs even though it knew that "[d]ue to this accreditation status, the Art Institute no longer qualifies as an eligible institution to participate in the Title IV, HEA programs as a for-profit institution." *Id.*  The Department also allowed the institutions to continue participating in Title IV programs without being accredited by unlawfully converting them to non-profit status and doing so retroactively.

99.     On May 22, 2019, Plaintiff Infusino and Principal Deputy Under Secretary of Education Jones testified before the Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform of the United States House of Representatives.  Mr.

Infusino implored: "On behalf of my fellow classmates, I hope that the Department of Education will step out of the shadows and do what is right for students." Exh. N at 4 (Written Testimony of Robert J. Infusino Before the Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, House of Representatives, 116th Congress (May 22, 2019)).

100.    Mr. Infusino did not know when he testified that what was hidden in the shadows was not just his school's loss of accreditation, but also the Department's unlawful actions of allowing the schools to participate in Title IV programs after they became ineligible on January 20, 2018, and continuing the schools' unlawful participation by converting the schools to non-profit status on May 3, 2018, without any statutory or regulatory authority for doing so.

101.    The Department did know these things.  However, Deputy Under Secretary Jones did not disclose them to the Committee.  Instead, she testified: "Let me be clear that it is the Department's position that those schools were accredited throughout the period between the change of control in January, and the closure in December 2018. Otherwise, the schools could not have participated in Title IV programs." Exh. O at 32 (Excerpt of Official Transcript, Hearing Examining For-Profit College Oversight and Student Debt Before the Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, House of Representatives, 116th Congress (May 22, 2019)).  These statements directly contradict the Department's position on May 3, 2018, when the Department acknowledged that the schools were not accredited, yet rendered them eligible to participate in Title IV programs by unlawfully converting them to non-profit status.  Ms. Jones did not disclose the conversions at the hearing.

102.     These misrepresentations and omissions have caused students, including Named

Plaintiffs, to mistakenly believe that the loans made to them to attend IIA and AIC in 2018—

which for most of them have come due—were lawful, when they were not.

## CLASS ACTION ALLEGATIONS

103.     Named Plaintiffs bring this action on their own behalf and, pursuant to Federal

Rule of Civil Procedure 23(a) and (b)(2), on behalf of a Class of all persons to whom the

Department of Education issued loans to pay tuition or other expenses at IIA and AIC on or after

January 20, 2018.

104.     On information and belief, approximately 1,500 students were enrolled at IIA and

AIC between January 20, 2018 and the schools' closings on December 14, 2018.  On information

and belief, the vast majority of these students were issued loans by the Department.  The specific

identity of all Class members is ascertainable from the Department's records.

105.     The case raises common questions of law and fact that are capable of classwide

resolution. Most centrally, it raises the questions of whether Defendants allowing ineligible

schools and students to participate in the Title IV programs, including through its TPPAs with

IIA and AIC in 2018 and their conversion of the schools to non-profit status, exceeded their

statutory authority and violated the Administrative Procedure Act and, if so, whether loans that

the Department issued for tuition and other expenses at the schools in 2018 are legal and

enforceable.

106.     Defendants' unlawful decisions that allowed IIA and AIC to participate in Title

IV, causing students to take out loans they were not eligible for, to pay for unaccredited courses

and degrees, were identical as to the entire Class, all of whom were issued loans that the

Department could not have issued but for those unlawful decisions.  Defendants' challenged

actions therefore apply generally to the entire Class, making final injunctive or corresponding

declaratory relief regarding those decisions appropriate for the Class as a whole.

107.    Named Plaintiffs' claims are typical of the claims of other Class members as they

arise out of the same course of conduct and the same legal theories, and they challenge

Defendants' conduct with respect to the Class as a whole.

108.    Named Plaintiffs are capable of and committed to fairly and adequately protecting

the interests of the Class and have no conflicts with other Class members.

109.    Named Plaintiffs are represented by counsel experienced in higher education law,

administrative law and class action litigation.

## CLAIMS FOR RELIEF

### Count One

**(Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C) for Allowing IIA and AIC to Participate in Title IV When They Were Ineligible)**

110.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as

if fully set forth herein.

111.    The Department's actions allowing schools to participate in Title IV by entering

into and continuing TPPAs with IIA and AIC after they were purchased by DCF, even though

they were ineligible, and issuing loans to ineligible students, constitute "final agency action[s]

for which there is no other adequate remedy in court" and is "subject to judicial review."  5

U.S.C. § 704; *see id.* § 702.

112.    Under the Administrative Procedure Act, a "reviewing court shall … hold

unlawful and set aside agency action … found to be … arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction,

authority, or limitations."  *Id.* § 706(2)(A), (C).

28

113.    The Department's decisions to allow IIA and AIC to participate in Title IV by entering into and continuing TPPAs, and issuing loans to ineligible students, were "not in accordance with law" and/or "in excess of statutory jurisdiction, authority, or limitations." Alternatively, the decisions were "arbitrary" and "capricious."

114.    Had the Department prohibited IIA and AIC from participating in Title IV, as required by law, students, including Named Plaintiffs, could not have borrowed money from the federal government to attend the schools.  Therefore, any loans issued by the Department for the purposes of attending those schools during 2018 were unlawful and void *ab initio*.

## Count Two

### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C) for Converting IIA and AIC to Non-Profit Status Retroactive to January 20, 2018)

115.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

116.    The Department's May 3, 2018 conversion of IIA and AIC to non-profit status retroactive to January 20, 2018 constitutes a "final agency action for which there is no other adequate remedy in court" and is "subject to judicial review."  5 U.S.C. § 704; *see id.* § 702.

117.    Under the Administrative Procedure Act, a "reviewing court shall … hold unlawful and set aside agency action … found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations."  *Id.* § 706(2)(A), (C).

118.    The Department's decision to allow IIA and AIC to participate in Title IV by converting them to non-profit status retroactive to January 20, 2018 was "not in accordance with law" and/or "in excess of statutory jurisdiction, authority, or limitations."  Alternatively, the decision was "arbitrary" and "capricious."

119.     Had the Department prohibited IIA and AIC from participating in Title IV, as

required by law, students, including Named Plaintiffs, could not have borrowed money from the

federal government to attend the schools. Therefore, any loans issued by the Department for the

purposes of attending those schools after January 20, 2018 were unlawful and void *ab initio*.

## Count Three

### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B) and the Due Process Clause of the Fifth Amendment)

120.     Plaintiff repeats and incorporates by reference each of the foregoing allegations as

if fully set forth herein.

121.     Under the Administrative Procedure Act, a "reviewing court shall … hold

unlawful and set aside agency action … found to be … contrary to constitutional right, power,

privilege, or immunity." 5 U.S.C. § 706(2)(B).

122.     The Fifth Amendment provides: "No person shall . . . be deprived of life, liberty,

or property, without due process of law."  Due process requires that the government provide

procedural safeguards that ensure against the risk of erroneous deprivation of an individual's

property interest and prevents governmental power from being used for purposes of oppression,

or abuse of government power that shocks the conscience, or action that is legally irrational, and

not in furtherance of any legitimate state interests.

123.     Plaintiffs have a constitutionally protected property interest in not having to pay

back loans that were incurred through Defendants' unlawful conduct alleged herein and in

maintaining their income or savings that would be used to repay such loans, which the

Department knew were issued in violation of Title IV and its implementing regulations.

124.     The Department deprived Plaintiffs of their constitutionally protected property

interests when it failed to notify them that their federal student loans did not meet the statutory

and regulatory requirements of Title IV and failed to provide them an opportunity to challenge

their obligations to repay the loans.  Instead, the Department concealed that the loans were

defective by unlawfully converting the schools to non-profit status retroactive to the date the

schools became ineligible to participate in Title IV.  The Department has continued to conceal

this fact not only from students, but also from the United States Senate, Exh. M, and the United

States House of Representatives, Exh. O.

125.    The Department's intentional concealment of IIA and AIC's ineligibility to

participate in Title IV not only caused Plaintiffs to receive loans from the Department that were

invalid under Title IV and its implementing regulations, but also created a repayment obligation

for Plaintiffs without any opportunity to challenge the validity of those loans on the basis that

Plaintiffs were not eligible to receive them.

126.    The Department's May 3, 2018 letters, retroactively granting IIA and AIC non-

profit status without any basis, along with other misrepresentations made by the Department

about the schools' Title IV eligibility, shocks the conscience insofar as the Department

intentionally concealed its unlawful action allowing the ineligible schools to participate in Title

IV, with complete indifference to the effect on the students who were being misled into incurring

debt to the government to pay for courses that were not accredited.

127.    For the reasons explained above, all loans issued to students after January 20,

2018, to attend IIA and AIC are therefore unenforceable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1.      declare that the Department's decisions to enter into and continue TPPAs with IIA and AIC were arbitrary and capricious, not in accordance with law, in excess of statutory authority, and procedurally infirm, and that any loans issued by the Department to pay tuition or other expenses at IIA and AIC on or after January 20, 2018 are null and void, or otherwise unenforceable;

2.      declare that the Department's May 3, 2018 decision to convert IIA and AIC to non-profit status retroactive to January 20, 2018 was arbitrary and capricious, not in accordance with law, in excess of statutory authority, and procedurally infirm, and that any loans issued by the Department of Education to pay tuition or other expenses at IIA and AIC on or after January 20, 2018 are null and void, or otherwise unenforceable;

3.      declare that the Department's issuance of loans to Plaintiffs to pay tuition to attend IIA and AIC on or after January 20, 2018 violated Plaintiffs' rights to due process, and thus were unlawful and void *ab initio*, and order the Department to vacate those loans;

4.      declare Defendants, their officers, their employees, and their agents, must vacate, cancel, discharge, forgive and/or otherwise nullify Plaintiffs' outstanding federal loan balances incurred on or after January 20, 2018, and refrain from attempting to collect Plaintiffs' outstanding federal loan balances;

5.      exercise its equitable authority to order the Department to apply—and issue a written determination, within 30 days of the entry of such order, of how it applied—its "exceptional circumstances" authority under 34 C.F.R. § 68.214 to the circumstances herein including: (a) the facts herein established and/or found; (b) the Department's stated policy of increasing the 120-day closed school discharge "window" to 180-days; and (c) the Department's

32

stated policy that the "revocation or withdrawal by an accrediting agency of the school's institutional accreditation" and "the termination by the Department of the school's participation in a title IV, HEA program" may be considered exceptional circumstances to justify the extension of the discharge window.  *See* 84 Fed. Reg. at 49,850, 49,890; *id.* at 49,930.

      6.     award Plaintiffs their costs, attorneys' fees, and other disbursements for this action; and

      7.     grant any other relief this Court deems appropriate.

*/s/ Eric Rothschild*
Eric Rothschild (D.C. Bar No. 1048877)
Alexander S. Elson (D.C. Bar No. 1602459)
Alice Yao (D.C. Bar No. 493789)*
National Student Legal Defense Network
1015 15th Street NW, Suite 600
Washington, DC 20005
(202) 734-7495
eric@defendstudents.org
alex@defendstudents.org
alice@defendstudents.org

**Counsel for Plaintiffs**

*\* D.D.C. Bar Application Forthcoming*

Dated: October 22, 2019