## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ROBERT J. INFUSINO,** *et al.*, | |
| Plaintiffs, | |
| v. | |
| **MIGUEL A. CARDONA,** in his official capacity as U.S. Secretary of Education, *et al.*, | Case No. 19-cv-3162 (CRC) |
| Defendants. | |

### MEMORANDUM OPINION AND ORDER

Plaintiffs were formerly enrolled as students at two for-profit art institutes.  After learning that the schools were not accredited during a portion of the time they attended, Plaintiffs brought this lawsuit.  Due to the loss of accreditation, Plaintiffs claimed that the student loans issued to them by the Department of Education (the "Department") were unlawful, and they sought a declaratory judgment to that effect.  The Department voluntarily cancelled the loans in question shortly after Plaintiffs filed suit, and the parties agreed to a settlement in 2020.  Before the Court is Plaintiffs' petition for attorneys' fees and costs under the Equal Access to Justice Act ("EAJA").  For the reasons explained below, the Court finds that Plaintiffs are prevailing parties and will grant an award of fees, although in a smaller amount than Plaintiffs request.

### I.   Background

Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 et seq., governs the administration of the federal student loan program.  Compl. ¶ 17.  To participate in Title IV programs, for-profit colleges must be accredited by a recognized accrediting agency, and nonprofit schools must be either accredited or pre-accredited.  Id.; see 34 C.F.R. §§ 600.4(a), 600.5(a).

Plaintiffs attended two for-profit art schools, the Illinois Institute of Art ("IIA") and the Art Institute of Colorado ("AIC").  Compl. ¶ 1.  In January 2018, a nonprofit corporation—the Dream Center Foundation—purchased the schools while the Plaintiffs were still students.  See id. ¶¶ 10–13, 24.  The Dream Center applied to the Department of Education to convert the schools to nonprofit status, as defined by the Department's regulations.  Id. ¶ 26.  The Dream Center also applied to the Higher Learning Commission ("HLC"), the accrediting agency that had accredited the schools before the Dream Center's purchase, to approve the change in ownership and retain the schools' accreditation.  Id. ¶ 34.  On September 12 2017, the Department sent the Dream Center a letter regarding its request for nonprofit status, stating that after a preliminary review, it did "not see any impediment" to approving nonprofit status, but that formal approvals were "contingent on" the schools' further demonstration of "compliance with the requirements of 34 C.F.R. § 600.20(g) and (h), the Department's review and approval of any submissions required by those regulatory provisions, and any further documentation and information requested by the Department."  Compl. Ex. C at 2.  The Department added that the Dream Center would "have to submit additional documentation and information to confirm" that it met all the regulatory elements of nonprofit status.  Id. at 6.

On November 16, 2017, HLC sent the Dream Center a letter—cc'ing the Department— stating that the Board had voted to approve the schools' change in ownership "subject to the requirement" that the schools enter "Change of Control Candidacy Status," a pre-accreditation status during which the schools would have to demonstrate their full compliance with HLC's criteria for accreditation.  See Compl. Ex. E at 1–2, 7.  The schools accepted HLC's pre-accreditation offer.  Compl. ¶ 37; see Compl. Ex. F.  On February 20, 2018, the Department executed temporary program participation agreements ("TPPAs") with the schools allowing

2

them to participate in federal student loan programs, despite their pre-accreditation status.
Compl. ¶ 41.

Sometime in the next several months, the Department came to the belated realization that, because of the change of ownership, the schools were no longer accredited, as stated in HLC's November 2017 letter.  On May 3, 2018, the Department sent letters to IIA and AIC informing them that, because the schools were merely candidates for accreditation, they were not eligible to participate in Title IV and had not been eligible since January 20, 2018.  Id. ¶¶ 47–50; see Compl. Exs. A & B.  To avoid a lapse of eligibility, however, the Department retroactively placed the schools on a "temporary interim nonprofit status."  Compl. Exs. A & B.   In June 2018, the schools and the Dream Center informed the students about the loss of accreditation. Compl. ¶¶ 65–66.  Most of the Plaintiffs soon withdrew from the schools, and both schools closed by the end of 2018.  Id. ¶¶ 10–13, 80.

In October 2019, Plaintiffs brought this lawsuit against the Department, alleging that its "decisions allowing IIA and AIC to participate in Title IV, and students to take out loans to attend those schools" violated the Administrative Procedure Act ("APA").  Id. ¶ 5.  On October 30, 2019, a week after Plaintiffs had filed suit but before they had served the complaint on the Department, the Secretary of Education approved the decision to cancel the loans taken out by IIA and AIC students between January 20, 2018 and December 2018, a decision which the Department announced about a week later via press release.  Declaration of Principal Deputy Undersecretary Diane Jones ("Jones Decl.") ¶¶ 11–12. After issuing the press release, the Department contacted Plaintiffs seeking a dismissal.  Pet. for Attorneys' Fees at 11.  Plaintiffs declined to dismiss the case, stating that, among other things, they wanted the Department to confirm that it would not issue former students IRS Form 1099s for the cancelled loan amounts,

and that it would extend the closed-school discharge lookback period, notify potential class members about the expanded eligibility, and ensure that loan servicers were updated about cancelled loans.  Id.  After some negotiation, the parties reached an agreement to settle the case.

The parties filed a Stipulated Order of Dismissal ("Stipulated Order") on March 27, 2020. The Stipulated Order detailed the actions the Department had already taken (such as cancelling the relevant loans and confirming that no 1099s would issue), as well as additional tasks that it would perform later, including emailing student borrowers about the loan cancellations and updating its webpage with a copy of the Stipulated Order and contact information for the Department's loan servicers.  See Stipulated Order at 1–4.  The stipulation concluded by asking the Court to sign the proposed order (1) staying the case for 60 days, after which the Department would be required to "file a report addressing each of the obligations listed above," and (2) dismissing the case "[u]pon . . . Defendants' fulfillment of the obligations provided herein."  Id. at 4–5.  In lieu of signing the Stipulated Order, the Court entered two Minute Orders.  The first Order stayed the case for 60 days and ordered the Department "to file a report by May 29, 2020 addressing each of the obligations listed in the [12] Stipulated Order of Dismissal," as the parties had requested.  Minute Order, Mar. 30, 2020 ("March Minute Order").  On May 29, 2020, the Department filed a status report updating the Court on the completion of its obligations contained in the Stipulated Order.  Defs.' Report Regarding Obligations Contained in Stipulation of Dismissal, ECF No. 15.  The Department reported that it had completed the outstanding tasks in the Stipulated Order.  Id.  Accordingly, in the second Minute Order, the Court dismissed the case "[i]n light of Plaintiff's [12] Stipulation of Dismissal and the Government's [15] Status Report." Minute Order, June 3, 2020 ("June Minute Order"); see Stipulated Order at 5.

Plaintiffs petitioned for attorneys' fees and costs under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, and the petition is ripe for the Court's consideration.

## II.    Analysis

### A.    <u>Subject Matter Jurisdiction</u>

Under the EAJA, "a court shall award to a prevailing party" fees and other expenses "incurred by that party in any civil litigation . . . brought by or against the United States in any court *having jurisdiction of that action*."  28 U.S.C. § 2412(d)(1)(A) (emphasis added). Accordingly, to obtain fees under the EAJA, "there must be standing and otherwise proper subject matter jurisdiction for the underlying action."  <u>Advanced Mgmt. Tech. v. FAA</u>, 211 F.3d 633, 638 (D.C. Cir. 2000) (emphasis omitted).  The Department contends that this Court lacked subject matter jurisdiction over Plaintiffs' underlying action because, according to the Department, "the key relief sought by Plaintiffs, and the only relief that would redress their claim of injury, is injunctive relief," which is unavailable under the HEA.  Opp. at 12; <u>see</u> 20 U.S.C. § 1082(a)(2) (stating that "no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Secretary or property under the Secretary's control"); <u>Student Loan Mktg. Ass'n v. Riley</u>, 907 F. Supp. 464, 474 (D.D.C. 1995).

The Court has subject matter jurisdiction.  The Court begins by noting the incongruity of the Department's invocation of the Court's jurisdiction to endorse the parties' settlement agreement by signing the Stipulated Order and its current position that the Court lacked jurisdiction from the start.  In any case, although the HEA's anti-injunction provision bars injunctive relief, such "anti-injunction clauses do not preclude consideration of requests for declaratory relief."  <u>Id.</u> (citing <u>Thomas v. Bennett</u>, 856 F.2d 1165, 1167 (8th Cir. 1988); and then citing <u>Pro Schs., Inc. v. Riley</u>, 824 F. Supp. 1314, 1315–16 (E.D. Wis. 1993))); <u>accord</u> <u>Bank of</u>

America NT & SA v. Riley, 940 F. Supp. 348, 351 (D.D.C. 1996) ("There is no indication in the HEA, and none has been cited from its legislative history, that Congress intended to eliminate *all* federal jurisdiction"—including jurisdiction to issue declaratory relief—"by the enactment of § [1082](a)(2)."). Here, Plaintiffs' complaint sought declaratory relief, including declarations that the Department's decisions to enter into TPPAs with IIA and AIC, to convert the schools to retroactive nonprofit status, and to issue loans to Plaintiffs after January 20, 2018 were arbitrary, capricious, and unlawful. Compl. at 32. Even if some of Plaintiffs' prayers for relief—such as the request for a declaration obliging the Department to "vacate, cancel, discharge, forgive and/or otherwise nullify" the disputed loans, id.—appear to seek injunctive relief by another name, see Am. Ass'n of Cosmetology Schs. v. Riley, 170 F.3d 1250, 1254 (9th Cir. 1999), those requests would not deprive the Court of "jurisdiction of th[e] action" as to Plaintiffs' other requests for declaratory relief, 28 U.S.C. § 2412(d)(1)(A).

Indeed, the Department concedes that "a declaration of invalidity and remand to the agency might provide some redress for a plaintiff's injury even in the absence of injunctive relief." Opp. at 13. The Department nevertheless asserts that no such relief was possible here because the Department voluntarily cancelled the loans shortly after Plaintiffs filed suit. Id. But, as described more thoroughly below, Plaintiffs both sought and obtained further relief from the Department as a result of this litigation even after the Department cancelled the loans at issue. For the same reasons, the Court also rejects the Department's suggestion that Plaintiffs' case was mooted when the parties negotiated and sought the Court's sanction of the settlement of Plaintiffs' claims. Accordingly, the Court has subject matter jurisdiction and proceeds to the merits of Plaintiffs' fee petition.

B.  <u>Prevailing Party</u>

To be entitled to fees under the EAJA, Plaintiffs must first establish that they are a "prevailing party." 28 U.S.C. § 2412(d)(1)(A). The D.C. Circuit follows a three-part test to determine whether a litigant is a prevailing party under the EAJA. See <u>Thomas v. Nat'l Sci. Found.</u>, 330 F.3d 486, 492–93 (D.C. Cir. 2003); <u>Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.</u>, 532 U.S. 598, 603–07 (2001). "To obtain 'prevailing party' status, the plaintiff must show first that there was a court-ordered change in the legal relationship between the plaintiff and the defendant; second, that the judgment was rendered in the claimant's favor; and third, that the claimant was not a prevailing party merely by virtue of having acquired a judicial pronouncement rather than judicial relief." <u>Artis ex rel. S.A. v. District of Columbia</u>, 543 F. Supp. 2d 15, 22 (D.D.C. 2008) (quoting <u>Robinson v. District of Columbia</u>, No. 06-1253 (RCL), 2007 WL 2257326, at *4 (D.D.C. Aug. 2, 2007)); <u>see also</u> <u>Thomas</u>, 330 F.3d at 492–93.

To start, a defendant's agreement to terms in a stipulation memorialized in a court order is a suitable basis for awarding attorney's fees. <u>Texas v. Holder</u>, 63 F. Supp. 3d 54, 64 (D.D.C. 2014); <u>see</u> <u>Campaign for Responsible Transplantation v. FDA</u>, 511 F.3d 187, 197 (D.C. Cir. 2007) ("Even though the parties arrived at a mutually acceptable agreement, we held that the order memorializing the agreement created the necessary judicial *imprimatur* for plaintiffs to be a prevailing party."); <u>see also</u> <u>Davy v. CIA</u>, 456 F.3d 162, 163–64 (D.C. Cir. 2006) (explaining that the district court memorializing a stipulation into an order made the stipulation judicially enforceable). Here, the parties filed a proposed stipulated order of dismissal, detailing the Department's actions in response to Plaintiffs' suit and conditioning dismissal on, among other things, "Defendants' fulfillment of the obligations provided herein." Stipulated Order at 5. The proposed order included a signature block for the Court to adopt the order. <u>Id.</u> at 5–6. The Court

did not sign the proposed order because the stipulation required the Department to undertake several obligations in the future.  Accordingly, the Court "ordered" the Department "to file a report by May 29, 2020, addressing each of the obligations listed in the" Stipulated Order, see March Minute Order, and only after the Department filed a status report confirming that it had complied with those outstanding obligations did the Court dismiss the case "[i]n light of" the stipulation and status report, see June Minute Order.  Thus, "[e]ven though the parties arrived at a mutually acceptable agreement" on their own, the Court's "order memorializing the agreement created the necessary judicial imprimatur for plaintiffs to be a prevailing party." Campaign for Responsible Transplantation, 511 F.3d at 197 (emphasis omitted).

Additionally, the stipulation and the Court's two Minute Orders effected a court-ordered change in the parties' legal relationship in Plaintiffs' favor.  A party is eligible for a fee award when there is a "material alteration of the legal relationship of the parties." Buckhannon, 532 U.S. at 604 (quoting Tex. State Teachers Ass'n v. Garland Independent Sch. Dist., 489 U.S. 782, 792–93 (1989)).  Here, the Stipulated Order contained, among other things, the Department's commitment that "no IRS Form 1099s will be issued for the Cancelled Loans or refunds described" therein.  Stipulated Order at 2.  By placing the Court's imprimatur on that promise, the Court's Minute Orders constituted a "judicially sanctioned change in the legal relationship of the parties." Buckhannon, 532 U.S. at 605; see also Davy, 456 F.3d at 166 ("Where a settlement agreement is embodied in a court order such that the obligation to comply with its terms is court-ordered, the court's approval and the attendant judicial over-sight (in the form of continuing jurisdiction to enforce the agreement) may be equally apparent." (quoting Smyth ex rel. Smyth v. Rivero, 282 F.3d 268, 281 (4th Cir. 2002))).

Moreover, before the Court would order the case dismissed, the Department was tasked with completing specific obligations and submitting a status report addressing the completion of those obligations.  And, the Department's obligations benefitted the Plaintiffs beyond merely "facilitat[ing] the litigation process."  Campaign for Responsible Transplantation, 511 F.3d at 195–96 (order compelling production of a Vaughn index, without more, was not enough to create prevailing party status).  To comply with the Court's Minute Order and achieve a dismissal of the action, the Department was required to notify borrowers that it had extended the closed school loan discharge period back to January 20, 2018, to update its webpage regarding the closed schools with a web link to the Closed School Discharge application (thereby enabling students to obtain debt relief), and to confirm that loan servicers had updated credit reporting agencies about the cancelled loans so that borrowers would not have any remaining balance on those loans.  Stipulated Order at 2–4.  The Department took these steps "only after the order was issued" directing them to do so, and it fulfilled its obligations "pursuant to that order." Campaign for Responsible Transplantation, 511 F.3d at 197.  Accordingly, the Court's incorporation of the parties' stipulation is a sufficient "court-ordered change" in the relationship between them.  See id. ("Once an order has been adopted by the court, requiring the agency to release documents, the legal relationship between the party changes." (emphasis omitted)); SecurityPoint Holdings, Inc. v. TSA, 836 F.3d 32, 37–38 (D.C. Cir. 2016) (holding that a prevailing party need not "obtain a change in the opposing party's 'primary conduct'" so long as the party achieved "'some of the benefit . . . sought in bringing suit,'" including, for instance, remand to the agency (alteration in original) (first quoting Waterman S.S. Corp. v. Maritime Subsidy Bd., 901 F.2d 1119, 1122 (D.C. Cir. 1990); and then quoting Shalala v. Schaefer, 509 U.S. 292, 302 (1993))).

Finally, for similar reasons, the Court's order is a "judicial pronouncement" accompanied by "judicial relief." Thomas, 330 F.3d at 492 (emphasis omitted) (quoting Buckhannon, 532 U.S. at 606). To succeed on this element, Plaintiffs need not show that the Stipulated Order granted them "all of the items [they] requested in [their] prayer for relief." Ctr. for Food Safety v. Burwell, 126 F. Supp. 3d 114, 122 (D.D.C. 2015). Rather, it is sufficient for this element that Plaintiffs "ha[ve] obtained 'something of value in the real world'" relating to their claims as a result of the litigation. Id. (quoting Env't Def. Fund, Inc. v. Reilly, 1 F.3d 1254, 1257 (D.C. Cir. 1993)). Here, in addition to listing the Department's voluntary actions described in the whereas clauses of the Stipulated Order, the Court required the Department to file a status report concerning additional obligations, fulfillment of which was a prerequisite to the stipulated dismissal. Those obligations included that the Department communicate with borrowers about the loan cancellation, update its webpage with important information on cancellation, and other steps that materially advanced Plaintiffs' overall goals of obtaining debt relief for attendees of IIA and AIC. Stipulated Order at 2–4. Although the Department had already agreed to cancel the disputed loans by the date of the Stipulated Order, these additional obligations afforded Plaintiffs "some of the benefit . . . sought in bringing suit." SecurityPoint, 836 F.3d at 38 (alteration in original) (quoting Schaefer, 509 U.S. at 302); see also Univ. Legal Servs. Prot. & Advoc., Inc. v. Knisley, No. 1:04-cv-01021 (RBW), 2006 WL 3623695, at *1, *3, *5 (D.D.C. Dec. 11, 2006) (finding that a stipulation ordering defendant to supply plaintiff requested information, even if not "based on" the statute underlying plaintiff's claim, gave plaintiff some of the benefit sought by bringing suit). The Court therefore concludes that the Plaintiffs are prevailing parties.

Analogizing to <u>Summers v. Department of Justice</u>, 569 F.3d 500, 505 (D.C. Cir. 2009), in which the D.C. Circuit concluded that a plaintiff obtained no judicial relief for prevailing party purposes when the Court merely ordered the parties to "file another joint status report by [a specific date] indicating" that an additional FOIA disclosure had "been made to plaintiff," the Department contends that the Stipulated Order similarly did not require them to take any "specific, substantive actions." Opp. at 18–20 (quoting <u>Summers</u>, 569 F.3d at 505). <u>Summers</u> is not on point. The court orders at issue there "required the FBI to do no more than to join with the plaintiff in filing status reports updating the court on any voluntary disclosures the agency may have made." <u>Summers</u>, 569 F.3d at 505. The court explained that these orders did *not* require "the FBI to make disclosures" or do anything aside from filing a status report. <u>Id.</u> Here, by contrast, the Court incorporated the parties' Stipulated Order into its March and June Minute Orders and dismissed the case only upon the "fulfillment" of the "obligations" described in the stipulation. Had the Department not complied with those substantive obligations, the Court would not have dismissed the case, even if the Department had filed status reports. By requiring the Department to take additional, real-world steps before dismissing the case, the orders in this case did more than merely recognize the existence of a settlement agreement, <u>see</u> Opp. at 20–21, and required more than a "strictly procedural" step of "facilitat[ing] the litigation process," <u>Campaign for Responsible Transplantation</u>, 511 F.3d at 196–97.

The Department also asserts that Plaintiffs are not prevailing parties because a party must show that it has achieved some success "on the merits of his claim" and that, here, "the three things that the Department said it would do were insubstantial and not part of the relief sought in Plaintiffs' complaint." Opp. at 22 (quoting <u>Nat'l Black Police Ass'n v. D.C. Bd. of Elections & Ethics</u>, 168 F.3d 525, 528 (D.C. Cir. 1999)). But, as already explained, Plaintiffs obtained

"judicial relief" by the Court's orders when they secured "something of value in the real world'"
as a result of the litigation.  <u>Ctr. for Food Safety</u>, 126 F. Supp. 3d at 122 (quoting <u>Env't Def.
Fund</u>, 1 F.3d at 1257).  What's more, although perhaps not the core of the relief sought in
Plaintiffs' complaint, the additional obligations imposed by the Court's orders were intimately
related to the complaint's primary goals of cancelling the loans and relieving borrowers of debts.
Guaranteeing that credit reporting agencies were aware of the cancelled loans would ensure that
Plaintiffs were not adversely affected by any outstanding payments on the loans.  Likewise,
providing public information on the Department's website about the lawsuit and how to apply for
closed-school student loan discharge would ensure that the affected borrowers could actually
benefit from the relief sought in the complaint.  Reply at 10 n.4.  By obtaining an order requiring
the Department to take those measures, Plaintiffs prevailed "on an 'important matter' in the
course of the litigation."  <u>Ctr. for Food Safety</u>, 126 F. Supp. 3d at 120 (quoting <u>Tex. State
Teachers Ass'n</u>, 489 U.S. at 790).  To the extent the Department "question[s] the 'degree of the
plaintiff's success,' this bears on 'the size of a reasonable fee, not [the] eligibility for a fee award
at all.'"  <u>Id.</u> at 122 (second alteration in original) (quoting <u>Tex. State Teachers Ass'n</u>, 489 U.S. at
790).

      C.  <u>Substantially Justified</u>

      Under the EAJA, a prevailing party is entitled to attorneys' fees and expenses "unless the
court finds that the position of the United States was substantially justified."  28 U.S.C.
§ 2412(d)(1)(A).  This inquiry focuses not only on the agency's litigation position but also its
underlying actions. <u>Am. Wrecking Corp. v. Sec'y of Lab.</u>, 364 F.3d 321, 325 (D.C. Cir. 2004).
"'Substantially justified' means 'justified in substance or in the main—that is, justified to a
degree that could satisfy a reasonable person.'"  <u>Carey v. FEC</u>, 864 F. Supp. 2d 57, 62–63

(D.D.C. 2012) (quoting <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)); <u>see also</u> <u>Taucher v.</u>

<u>Brown-Hruska</u>, 396 F.3d 1168, 1173 (D.C. Cir. 2005) (position is substantially justified if it has

"a reasonable basis both in law and fact" (quoting <u>Underwood</u>, 487 U.S. at 565)).  The

"Government has the burden of proving that its position . . . was 'substantially justified' within

the meaning of the Act."  <u>LePage's 2000, Inc. v. Postal Regul. Comm'n</u>, 674 F.3d 862, 867

(D.C. Cir. 2012) (alteration in original).

The Department has not carried its burden of showing that it was substantially justified in

permitting IIA and AIC to participate in Title IV despite the schools' change in ownership and

loss of accreditation.  To start, the Department does not meaningfully dispute that its February

2018 decision to enter into TPPAs with the two schools was contrary to applicable regulations.

Indeed, as the Department admitted in its May 2018 letters to IIA and AIC granting them

retroactive interim nonprofit status, "[t]he provisions of 34 C.F.R. 600.5(a)(6) require a

proprietary institution of higher education to be fully accredited to qualify as an eligible

institution for purposes of Title IV" and "do not allow for pre-accredited (or candidacy) status."

Compl. Ex. A at 2; <u>see also</u> Compl. Ex. B at 2.  And, although the Department may continue an

institution's participation in Title IV after a change of control "on a provisional basis," the

institution must first submit a "materially complete application" that includes, among other

things, a "copy of the document from the institution's accrediting association that—as of the day

before the change in ownership—granted or will grant the institution accreditation status."  34

C.F.R. § 600.20(g)(2)(ii); <u>see</u> <u>id.</u> § 600.20(h)(3)(iii) (requiring "approval of the change of

ownership from the institution's accrediting agency" for extensions of provisional participation

agreements).

Instead, the Department mainly asserts that, although it might have been wrong to grant the schools Title IV eligibility after the change in ownership, that mistake was excusable in light of "the confusion arising from HLC's decision to place the Institutes into a status that HLC had never used before."  Opp. at 25; see also id. at 26–30.  For instance, the Department suggests it was surprised to learn in March 2018 that the schools' "change of control candidacy status" was "equivalent to a preaccreditation status," maintaining that "[n]owhere in" its November 2017 letter "did HLC state that the Institutes were no longer accredited institutions, or that by accepting the" change of control candidacy status condition "it would forfeit its fully accredited status."  Id. at 26, 29.

The Department should not have been so surprised.  HLC's November 2017 letter stated, quite clearly, that the accrediting commission "considers five factors in determining whether to approve a requested Change of Control," that it "is the applying institution's burden . . . to demonstrate with clear and convincing evidence that the transaction meets these five factors," and that "the Institutes *did not demonstrate* that the five approval factors were met without issue."  Compl. Ex. E at 1–2 (emphasis added).  Rather, the schools demonstrated compliance sufficient only "to be considered for pre-accreditation status identified as 'Change of Control Candidate for Accreditation,' during which time each Institute can rebuild its full compliance with all the Eligibility Requirements and Criteria for Accreditation and can develop evidence that each Institute is likely to be operationally and academically successful in the future."  Id. at 2.  The letter went on to identify specific steps the schools must take in order to regain accreditation, including, for example, submitting "a highly detailed plan with timelines, action steps, and personnel assignments to remedy issues related to" compliance with some core accreditation standards.  Id. at 3.  Only if the schools complied with those steps and "provide[d]

clear, convincing and complete evidence of each institution meeting each Eligibility

Requirement and of making substantial progress towards meeting the Criteria for Accreditation"

would HLC reinstate accreditation.  Id. at 4.  Lest there be any doubt, HLC followed up with

another letter in January 2018 stating that any approval of the schools' change in ownership was

"specifically subject to a Change of Control Candidacy, which is effective immediately upon the

closing of the transaction," and requiring that the schools "have properly notified their students

of the acceptance of the Board's condition of Change of Control Candidacy and have clearly

stated its impact on current and prospective students."  Compl. Ex. G at 2.  In other words, by

November 2017 and certainly by January 2018, it was unambiguous that HLC had put the

schools in the equivalent of pre-accreditation status and had neither granted nor committed itself

to granting the schools accreditation after the change of ownership.  The Department's

contention to the contrary does not withstand scrutiny.[1]

Acknowledging its mistake, the Department next contends that, after it belatedly realized

that the schools lacked HLC accreditation, it acted reasonably when it granted them retroactive

temporary nonprofit status in May 2018 to avoid an interruption in their eligibility for Title IV

funds.  Opp. at 31–35.  Specifically, the Department asserts that Plaintiffs have identified "no

law that restricts the Department's exercise of discretion for when it can designate an institutions

[sic] as a nonprofit" and that nothing in the HEA or the regulations restricted "the Department's

discretion to approve nonprofit status" once the schools had submitted "documentation and

---

[1]  The Department cites a few HLC policies to imply that the schools' accreditation status
was unclear.  See Opp. at 27–28.  But as Plaintiffs correctly note, HLC's policy regarding change
of control states that when "HLC's Board decides to approve a proposed Change of Control,
Structure or Organization, it may decide so *subject to conditions on the institution or its
accreditation*."  HLC Policy INST.B.20.040, Higher Learning Comm'n (rev. Feb. 2022),
https://www.hlcommission.org/Policies/change-of-control-structure-or-organization.html
(emphasis added).  That is just what happened here.

approvals required by 34 C.F.R. § 600.20(g) and 34 C.F.R. § 600.20(h)."  Id. at 31–32.  But, as already explained, the Department was informed as early as November 2017 that the schools did not meet the requirements of §§ 600.20(g) and (h) because HLC had withdrawn its accreditation. See Compl. Ex. C at 7 (noting that approval of the change in ownership by the schools' accrediting agency was a material condition for provisional participation in Title IV and conversion to nonprofit status).

Moreover, the Department's argument ignores the fact that the regulations *do* restrict the Department's discretion in designating an institution a nonprofit.  As the Department itself explained in its September 2017 letter to the schools regarding their request for conversion to nonprofit status, programs that "seek to participate in Title IV" as nonprofit institutions "must meet the Department's requirements for that status" as defined in 34 C.F.R. § 600.2.  Compl. Ex. C at 3.  Specifically, the institution must (1) be "owned and operated by one or more nonprofit corporations or associations, no part of the net earnings of which benefit any private shareholder or individual;" (2) be "legally authorized to operate as a nonprofit organization by each State in which it is physically located;" and (3) be "determined by the U.S. Internal Revenue Service to be an organization to which contributions are tax-deductible in accordance with section 501(c)(3) of the Internal Revenue Code."  34 C.F.R. § 600.2.

Even if the Department is entitled to some discretion when deciding whether to designate an institution as a nonprofit for purposes of Title IV, that decision must be "based on a consideration of the relevant factors."  Conservation Law Found. v. Ross, 374 F. Supp. 3d 77, 89 (D.D.C. 2019) (quoting Am. Oceans Campaign v. Daley, 183 F. Supp. 2d 1, 4 (D.D.C. 2000)). Yet here, the Department's May 2018 letter announcing its decision to grant the schools temporary interim nonprofit status not only fails to mention any of the factors listed in § 600.2

but accounts for different considerations entirely—specifically the Department's interest in

"avoid[ing a] lapse of eligibility" resulting from its earlier misunderstanding of the schools'

accreditation status.  Compl. Exs. A & B at 2; see Nat. Res. Def. Council v. Nat'l Marine

Fisheries Serv., 71 F. Supp. 3d 35, 55 (D.D.C. 2014) (agency decision is arbitrary and capricious

if it "relied on factors which Congress has not intended it to consider" (quoting Motor Vehicle

Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983))).

The Department now asserts that it had "already spent months analyzing the change in

ownership" and the schools' "request that the Institutes be converted to nonprofit status (as that

term is defined in 34 C.F.R. § 600.2)" and that "nothing had come to the Department's attention"

since the fall of 2017 "that would have been at odds with approving the conversion to nonprofit

status."  Opp. at 29–30.  But aside from noting a desire to avoid a lapse in the schools' eligibility,

the Department's May letter never identified *any* basis for according the schools interim

nonprofit status.  And the Department's last written analysis of the schools' nonprofit

eligibility—in its September 2017 letter—stated that, although the Department did "not see any

impediment" to approving nonprofit status, formal approvals were "contingent on" the schools'

"compliance with the requirements of 34 C.F.R. § 600.20(g) and (h), the Department's review

and approval of any submissions required by those regulatory provisions, and any further

documentation and information requested by the Department."  Compl. Ex. C at 2.  The

Department's September 2017 letter further stressed that the schools, among other things, would

"have to submit additional documentation and information to confirm" the second and third

"elements of nonprofit status," would "need to establish that the Institutions' net income does not

benefit any party other than the Institutions," and would need to "submit evidence that the

consideration" stated in the purchase agreement "does not exceed the value of the assets being

transferred resulting in an impermissible benefit to another party."  Id. at 6.  Nothing in the

Department's May 2018 letter or briefing suggests that the schools ever took those steps to

demonstrate that they qualified for nonprofit status.

Thus, this case is wholly unlike Ambach v. Bell, 686 F.2d 974 (D.C. Cir. 1982) (per

curiam), which the Department cites for the proposition that the Court cannot scrutinize its

decision to award retroactive nonprofit status.  Opp. at 34–35.  In Ambach, the D.C. Circuit

deferred to the Department's thoughtful and thorough balancing—in a memorandum's "seven

numbered paragraphs"—of the pros and cons of using an older set of census data to allocate

educational assistance funds, when newer data would become available weeks before the funding

distribution deadline, see id. at 982–86.  Here, by contrast, the Department's May 2018 letters

neither explained whether the schools met § 600.2's criteria nor reasoned why avoiding a lapse

in Title IV eligibility would outweigh the risks to students of taking on debt to pay for courses

that were neither accredited nor eligible for nonprofit status.[2]

The Court does not question the Department's motives for allowing the schools to

continue to participate in Title IV so that their students could complete their studies.  But for the

foregoing reasons, the Court concludes that the Department has not carried its burden of showing

---

[2] The Department's reliance on Armstrong v. Accrediting Council for Continuing Education & Training, Inc., 980 F. Supp. 53 (D.D.C. 1997), is similarly misplaced.  Opp. at 32–33.  There, the plaintiff, who had enrolled in a poor-performing vocational school, sued the lenders and guarantors of loans used to attend the school.  Id. at 56, 62.  The "gravamen of plaintiff's complaint" was that "she was defrauded by" the vocational school she attended and that the school was "a sham because it did not meet the standards for accreditation."  Id. at 56.  Here, Plaintiffs' suit is based not on whether the schools were properly or improperly accredited but rather on the Department's failure to follow the law and its own regulations in permitting AIC and IIA to continue to participate in Title IV, despite their clear lack of accreditation.

its position was substantially justified.[3]  Plaintiffs are therefore entitled to fees under the EAJA,

and the Court proceeds to calculating the appropriate fee award.

    D.  Fee Amount

"The most useful starting point for determining the amount of a reasonable fee is the

number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."

Bennett v. Castro, 74 F. Supp. 3d 382, 397 (D.D.C. 2014) (quoting Hensley v. Eckerhart, 461

U.S. 424, 433 (1983)).  In calculating that lodestar, the Court focuses on "(1) whether the

attorneys charged a reasonable hourly rate; and (2) whether the time attorneys logged on the case

was reasonable."  In re Donovan, 877 F.2d 982, 990 (D.C. Cir. 1989).

    But determining the "product of reasonable hours times a reasonable rate does not end the

inquiry."  Hensley, 461 U.S. at 434; see also F.J. Vollmer Co. v. Magaw, 102 F.3d 591, 599

(D.C. Cir. 1996) (noting "that the product of a reasonable hourly rate and the number of hours

reasonably expended on the entire case only establishes a base for calculating the amount of

reimbursable fees").  Aside from the lodestar, "[t]here remain other considerations that may lead

the district court to adjust the fee upward or downward, including the important factor of the

'results obtained.'"  Hensley, 461 U.S. at 434.  To evaluate that factor, courts must address

whether the plaintiff "fail[ed] to prevail on claims that were unrelated to the claims on which he

succeeded" or "achieve[d] a level of success that makes the hours reasonably expended a

satisfactory basis for making a fee award."  Id.  When much of counsel's time is devoted "to the

litigation as a whole," the court "should focus on the significance of the overall relief obtained

---

[3]  Plaintiffs do not defend the Complaint's alternate theory for the Department's liability—that the Department's actions violated the Due Process Clause of the Fifth Amendment.  Compl. ¶¶ 122–27.  But whether or not that theory would have succeeded on the merits does not affect the Court's conclusion that the Department's actions were not substantially justified for the reasons just explained.

by the plaintiff." Id. at 435.  When a party achieves only a "partial or limited success," then the

lodestar value "may be an excessive amount."  Id. at 436.  In weighing these considerations, the

Court has "substantial discretion in fixing the amount of an EAJA award."  Commissioner, INS

v. Jean, 496 U.S. 154, 163 (1990); see Hensley, 461 U.S. at 436–37 ("There is no precise rule or

formula for making these determinations. The district court may attempt to identify specific

hours that should be eliminated, or it may simply reduce the award to account for the limited

success. The court necessarily has discretion in making this equitable judgment.").

     *1. The Lodestar Value*

The Court begins with the reasonable hourly rate.  The Department does not dispute that

Plaintiffs, if entitled to any fees at all, are entitled to a cost-of-living adjustment to the EAJA's

default $125 per hour rate.  Opp. at 37; see Role Models Am., Inc. v. Brownlee, 353 F.3d 962,

969 (D.C. Cir. 2004) (noting that the court had "found no case" denying a cost-of-living

adjustment).  Accordingly, at least to start, the Court adopts the hourly rate of $205.84 per hour.

The Court rejects, however, Plaintiffs' requests for bad-faith and specialized-skill

enhancements.  Under the EAJA, an award of attorney fees can be calculated at market rate—

such that the statutory cap in 28 U.S.C. § 2412(d)(2)(A)(ii) does not apply—upon a finding of

bad faith on the part of the opposing party.  See Gray Panthers Project Fund v. Thompson, 304 F.

Supp. 2d 36, 38 (D.D.C. 2004).  Such a finding must be supported by clear and convincing

evidence, and corresponding attorney's fees "will be awarded only when extraordinary

circumstances or dominating reasons of fairness demand."  Ass'n of Am. Physicians &

Surgeons, Inc. v. Clinton, 187 F.3d 655, 660 (D.C. Cir. 1999) (quoting Nepera Chem., Inc. v.

Sea-Land Serv., Inc., 794 F.2d 688, 702 (D.C. Cir. 1986)).  Actions evincing bad faith include

the "filing of a frivolous complaint or meritless motion," or "discovery-related misconduct."

Am. Hosp. Ass'n v. Sullivan, 938 F.2d 216, 219–20 (D.C. Cir. 1991).   Pre-litigation bad faith

may also be found where "a party, confronted with a clear statutory or judicially-imposed duty

towards another, is so recalcitrant in performing that duty that the injured party is forced to

undertake otherwise unnecessary litigation to vindicate plain legal rights." Id. at 220 (quoting

Fitzgerald v. Hampton, 545 F. Supp. 53, 57 (D.D.C. 1982)).

Plaintiffs have not shown that they are entitled to a bad-faith fee enhancement.  The

Department was not recalcitrant in remedying Plaintiffs' grievances, nor did it engage in any

dilatory litigation tactics.  To the contrary, the Department voluntarily granted the most

consequential relief Plaintiffs sought—the loan cancellations and extension of the closed-school

loan discharge relief—before Plaintiffs served their complaint.  Jones Decl. ¶¶ 11–12.

Furthermore, while the Department's confusion regarding the status of the schools' accreditation

was not justified, this type of error is distinguishable from situations in which parties are

"confronted with a clear statutory duty or judicially-imposed duty toward another" and

nevertheless disregard that duty.  Am. Hosp. Ass'n, 938 F.2d at 220 (quoting Fitzgerald, 545 F.

Supp. at 57).  Plaintiffs have not identified any "extraordinary circumstances" that would justify

market-rate fees.  Gray Panthers, 304 F. Supp. 2d at 39 (quoting Ass'n of Am. Physicians, 187

F.3d at 660).

Finally, Plaintiffs seek an additional enhancement for distinctive knowledge or

specialized skill.  See 28 U.S.C. § 2412(d)(2)(A) (permitting fees above the statutory rate upon a

showing of "a special factor, such as the limited availability of qualified attorneys for the

proceedings involved").  This enhancement is not justified when sufficiently skilled lawyers are

merely "in short supply."  See Underwood, 487 U.S. at 577–72 (explaining that such an

interpretation would obviate the statutory cap because "prevailing market rates for [a service] are

obviously determined by the relative supply of that [service]").  Instead, enhancement is justified

where: (1) attorneys have "distinctive knowledge or specialized skill" necessary for the litigation

and (2) such attorneys can be obtained only at their market rates.  Id. at 572; see also F.J

Vollmer, 102 F.3d at 598 ("[F]ee enhancement is available only for lawyers whose specialty

'requir[es] technical or other education outside the field of American law.'" (quoting Waterman

Steamship Corp. v. Maritime Subsidy Bd., 901 F.2d 1119, 1124 (D.C. Cir. 1990))).

 Plaintiffs argue that the enhancement is justified because their counsel "has extensive

knowledge, unique experience, and specialized skill in higher education, consumer protection,

and student loan law."  Pet. for Attorneys' Fees at 24.  But "expertise the lawyer acquired

through practice in a specific area of administrative law" alone is insufficient for an

enhancement.  Select Milk Producers, Inc. v. Johanns, 400 F.3d 939, 950 –51 (D.C. Cir. 2005).

Plaintiffs' successful litigation of alleged violations of the APA did not depend on "specialized

training justifying fee enhancement" but rather on their experience.  Id. at 951 (quoting F.J.

Vollmer, 102 F.3d at 598); see also F.J. Vollmer, 102 F.3d at 598 ("If expertise acquired through

practice justified higher reimbursement rates, then all lawyers practicing administrative law in

technical fields would be entitled to fee enhancements.").  Nor is counsel's familiarity with the

specific proceedings and factual record involved in this case a basis for an enhancement, as "in

all federal cases, clients presumably want to be represented by an attorney with experience in

federal litigation and who is familiar with the record at issue."  In re Sealed Case 00-5116, 254

F.3d 233, 236 (D.C. Cir. 2001).  The Court accordingly declines to apply a fee enhancement for

specialized knowledge or skill and will therefore start with the cost-of-living-adjusted rate of

$205.84 per hour.

As for the number of hours reasonably expended, Plaintiffs initially requested 296.1 hours but agreed, in their reply, to discount 11 disputed hours. Reply at 21, 23. Plaintiffs thus request reimbursement for 285.1 hours of work, amounting to a total lodestar amount of $58,684.98.

### 2.  Plaintiffs' Degree of Success

The Department disputes at least 80 hours' worth of time entries submitted by Plaintiffs. Opp. at 41–44. Rather than "performing an item-by-item accounting" of Plaintiffs' hours, the Court is "empowered to make percentage reductions" of fee requests. Peyton v. Kijakazi, 557 F. Supp. 3d 136, 144 (D.D.C. 2021) (quoting Copeland v. Marshall, 651 F.2d 880, 903 (D.C. Cir. 1980) (en banc)); see also Cobell v. Jewell, 234 F. Supp. 3d 126, 175–76 (D.D.C. 2017) (noting that "this Court has the discretion to impose a reasonable percentage reduction to the petition as a whole" and collecting cases). In light of the peculiar procedural posture and immediate settlement of this case, the Court believes employing the "hatchet" is more appropriate than the "scalpel" in this case, cf. Nat'l Venture Capital Ass'n v. Nielson, 318 F. Supp. 3d 145, 153 (D.D.C. 2018), and accordingly will reduce the fee award substantially.

Although the Court has concluded that Plaintiffs are properly considered prevailing parties in this action, some of the Department's arguments concerning subject matter jurisdiction and prevailing party status militate in favor of a significant across-the-board fee reduction. As the Department points out, the chief relief sought by Plaintiffs—the loan cancellation—was already in the works when Plaintiffs filed their complaint and was voluntarily granted before Plaintiffs effected service. Jones Decl. ¶¶ 11–12. To be sure, the filing of Plaintiffs' complaint may have spurred the Department to act more quickly, but Plaintiffs offer no evidence proving that point. Plaintiffs did successfully convince the Department to take additional steps, as stated

in the Stipulated Order, that protected borrowers from adverse tax treatment and enabled them to seek loan cancellation.  See supra at 8–11.  But the "overall relief obtained by the" Stipulated Order, Hensley, 461 U.S. at 435, was limited to the Department's obligations to notify borrowers that it had extended the closed-school loan discharge period back to January 20, 2018, to update its webpage, and to confirm that loan servicers had updated credit reporting agencies.  Those achievements, while sufficient to confer prevailing party status, were not expressly sought in Plaintiffs' complaint and are quite minimal compared to the actions the Department took on its own, without the Court's intervention.

Moreover, although the Court was empowered to order declaratory relief sufficient to create subject matter jurisdiction, see supra at 5–7, the Department is correct that the Court likely could not have ordered the principal relief sought in the complaint in any event—a declaration that the Department "must vacate, cancel, discharge, forgive and/or otherwise nullify Plaintiffs' outstanding federal loan balances incurred on or after January 20, 2018, and refrain from attempting to collect Plaintiffs' outstanding federal loan balances."  Compl. at 32.  The Court could not have granted that relief, although framed as a declaration, without violating the HEA's anti-injunction bar.  See Am. Ass'n of Cosmetology Schs., 170 F.3d at 1254 ("[T]he anti-injunction bar cannot be skirted by the simple expedient of labeling an action that really seeks injunctive relief as an action for 'declaratory relief.'").

The "most critical factor" in determining the size of a fee award "is the degree of success obtained."  Hensley, 461 U.S. at 436.  Focusing specifically on the relief provided by the Stipulated Order, as opposed to the actions the Department took on its own, and considering that this case involved no discovery, no answer, and no motion practice until the filing of this fee petition, the Court concludes that Plaintiffs did not "achieve a level of success that makes the

hours reasonably expended a satisfactory basis for making a fee award" of the size Plaintiffs'

request.  F.J. Vollmer, 102 F.3d at 599 (quoting Hensley, 461 U.S. at 434).

Accordingly, the Court will exercise its discretion and reduce Plaintiffs' fee award by

about 80%, to $11,737.  This figure more accurately represents "the degree of success obtained"

in the Stipulated Order.  Hensley, 461 U.S. at 436.[4]

## III.   Conclusion

For the foregoing reasons, the Court finds that Plaintiffs are prevailing parties within the

meaning of 28 U.S.C. § 2412(d)(1)(A), and that their net worth is below $2,000,000.

Accordingly, it is hereby

**ORDERED** that [17] Plaintiffs' Motion for Attorneys' Fees is GRANTED.  It is further

**ORDERED** that Plaintiffs are awarded $11,737 in fees and $424 in costs.

**SO ORDERED**.

 

 

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  November 4, 2022

---

[4]  The Department does not dispute Plaintiffs' request for $424 in costs, which the Court
will add to Plaintiffs' fee award.